UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6|26|13
```

————————————————————————————

JINGHONG SONG,

                  *Plaintiff,*

      -against-

YAO BROS. GROUP LP and
CHENGWAN YAO,

                *Defendants.*

————————————————————————————

Before: Richard K. Eaton, Judge[*]
Court No. 10 Civ. 04157 (RKE)

**FINDINGS OF FACT &**
**CONCLUSIONS OF LAW**

## I.    INTRODUCTION

On May 20, 2010, plaintiff Jinghong Song ("Ms. Song" or "plaintiff") filed a Complaint

against Yao Brothers Group LP ("Yao Bros. LP") and Chengwan Yao ("Mr. Yao") (collectively,

"defendants"). Compl. (ECF Dkt. No. 1). In her Complaint, plaintiff alleges that (1) Mr. Yao

traded futures and options as a broker without registering with the relevant futures trading

regulatory authorities and without disclosing Mr. Yao's unregistered status to plaintiff (the

trading as a broker without registration claim); (2) Mr. Yao misrepresented the facts and risks of

futures trading to plaintiff, which plaintiff relied upon when deciding to invest with defendants

(the misrepresentation claim); and (3) Mr. Yao breached his duty of care as plaintiff's agent by

failing to report account activity to plaintiff and by failing to manage plaintiff's investments with

reasonable care (the negligence claim). Compl. ¶¶ 12–17, 21–23. On May 20, 2011, defendants

filed an Answer to the Complaint denying each of these allegations. Answer ¶¶ 8–10 (ECF Dkt.

No. 24).

———————————

[*]    Judge Richard K. Eaton, of the United States Court of International Trade, sitting
by designation.

A bench trial[1] was held on April 23 and 24, 2012.[2] In preparation for trial, the parties

submitted, among other things, a Joint Pretrial Order, trial exhibits, and Pretrial Memoranda. *See*

Joint Pretrial Order (Apr. 4, 2012) ("Pretrial Order"); Pl.'s Trial Exs. A–I ("Pl.'s Ex."); Defs.'

Trial Exs. A–Z ("Defs.' Ex."); Pl.'s Pretrial Mem. (Apr. 5, 2012) (ECF Dkt. No. 46) ("Pl.'s

Mem."); Defs.' Pretrial Mem. (Apr. 11, 2012) (ECF Dkt. No. 47) ("Defs.' Mem.").

At the trial, the court had an opportunity to observe witness demeanor and assess witness

credibility during cross examination and redirect examination. Plaintiff's witnesses were Ms.

Song and Mr. Yao,[3] and defendants' witness was Mr. Yao.

---

[1]    Plaintiff had desired a jury trial, but "failed to demand a jury trial in her pleadings as required by Rule 38(b) and so has waived her right to a jury trial pursuant to Rule 38(d)." Ct. Order at 1 (Sept. 7, 2011) (ECF Dkt. No. 33) (Holwell, J.). Plaintiff subsequently "request[ed] leave from the Court to serve an untimely demand for a jury trial." Ct. Order at 1 (Sept. 7, 2011). Recognizing that "[i]n some circumstances Courts have exercised their authority . . . to allow cases to be tried before a jury even where a party has not made a timely jury demand," the court granted plaintiff's request, instructed her to "proceed by formal motion," and established a briefing schedule for such a motion. Ct. Order at 1 (Sept. 7, 2011). Plaintiff, however, failed to make any such motion. Therefore, the case proceeded as a bench trial.

[2]    This court has: (1) federal question jurisdiction pursuant to 28 U.S.C. § 1331 (2006) because plaintiff's first two claims are made under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2006), and (2) diversity of citizen jurisdiction under 28 U.S.C. § 1332 because complete diversity exists.

[3]    Plaintiff also proposed to call David S. Hsu and Hearst Zhang as expert witnesses. Pretrial Order 19. While the parties agreed to exclude the expert testimony of David S. Hsu during the pretrial conference, defendants also moved to exclude the testimony of plaintiff's expert, Hearst Zhang, on the grounds that plaintiff's proffered expert report failed to meet the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B).

By order dated May 1, 2012, the court granted the motion, thereby excluding Mr. Zhang's proffered testimony, finding that the report failed to meet the requirements of Rule 26 because it (1) did not provide a complete statement of the basis and reasons for Zhang's opinion; (2) did not adequately identify the facts or data considered by the witness in forming his opinions; (3) did not identify any exhibits to be used in support of the expert's opinions; (4) did not adequately list the witness' qualifications; (5) did not provide a list of all publications Zhang authored in the previous ten years; and (6) did not list all other cases during the last four years in which the expert testified. Ct. Order (May 2, 2012) (ECF Dkt. No. 52).

Plaintiff and defendants each submitted Post-Trial Proposed Findings of Fact and Conclusions of Law[4] on June 19, 2012 and July 13, 2012, respectively. *See* Pl.'s Proposed Findings of Fact & Conclusions of Law (June 19, 2012) (ECF Dkt. No. 53) ("Pl.'s Findings"); Defs.' Proposed Findings of Fact & Conclusions of Law (July 13, 2012) (ECF Dkt. No. 54) ("Defs.' Findings"). A revised trial transcript was approved by the court on August 2, 2012. Ct. Order (Aug. 2, 2012) (ECF Dkt. No. 58); *see* Trial Tr. Vol. 1, Apr. 23, 2012 ("Tr. Vol. 1"); Trial Tr. Vol. 2, Apr. 24, 2012 ("Tr. Vol. 2").

As explained more fully below, the court concludes that plaintiff has not met her burden of proving by a preponderance of the evidence (1) that Mr. Yao knowingly and willfully traded as a broker without registration with the relevant authorities and without disclosure to plaintiff of his unregistered status; (2) that Mr. Yao knowingly and willfully misrepresented the facts and risks of futures trading to plaintiff and plaintiff relied upon such misrepresentations when deciding to invest with defendants; and (3) that Mr. Yao breached his duty of care as plaintiff's agent by failing to report account activities to plaintiff, and by failing to manage plaintiff's investments with reasonable care.[5]

---

[4]    The parties failed to present their Findings of Fact and Conclusions of Law in numbered paragraphs, despite the court's order directing them to do so. Ct. Order (Apr. 25, 2012) (ECF Dkt. No. 51) ("[T]he parties' proposed Findings of Fact and Conclusions of Law shall be presented in numbered paragraphs."). Therefore, citations to Pl.'s Findings and Defs.' Findings are to page numbers in the documents.

[5]    It should be noted that most of plaintiff's claims could have been resolved on a motion for summary judgment, however, no such motion was filed in this case.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court's Findings of Fact and Conclusions of Law follow.[6] Fed. R. Civ. P. 52(a)(2006).

## II.   FINDINGS OF FACT

### A. Ms. Song

1.   Ms. Song was born in mainland China and immigrated to the United States in 2006. (Pl.'s Findings 1; Tr. Vol. 1, at 40:21–40:22, 41:4–41:5).

2.   Ms. Song received the equivalent of an associate's degree in China. (Pl.'s Findings 1; Tr. Vol. 1, at 41:9–41:21).

3.   Ms. Song and Mr. Yao's wife were friends and college classmates in Beijing, where they graduated in 1990. Ms. Song remained in contact with Mr. Yao's wife over the years. (Defs.' Findings 5, 7; Tr. Vol. 1, at 42:4–43:14; Tr. Vol. 2, at 4:25–6:4).

4.   In December 1991, Ms. Song moved to the United States with her first husband under a foreign student's spouse visa. They were divorced in 1992. Ms. Song married her second husband in New York in 1996. They had two children and moved to Hong Kong and then to Beijing. (Pl.'s Findings 1; Defs.' Findings 5, 7; Tr. Vol. 1, at 40:23–41:5; Tr. Vol. 2, at 5:3–6:4).

5.   After Ms. Song's second marriage ended in divorce, she received a settlement of approximately $1,000,000, in addition to alimony and child support. Half of the settlement money Ms. Song received was to be held in trust for her children. (Pl.'s Findings 1; Defs.' Findings 5; Tr. Vol. 1, at 45:5–45:9, 75:9–75:13).

6.   In 2006, Ms. Song moved back to New York. At this time, she was in regular telephone contact with Mr. Yao's wife and visited Mr. Yao's family several times at their home in Maryland and then in Virginia. (Defs.' Findings 7; Tr. Vol. 1, at 42:17–42:21; Tr. Vol. 2, at 5:20–6:4).

7.   For approximately two years prior to investing with defendants in 2007, Ms. Song handled her own investments using an online Scottrade trading account. (Pl.'s Findings 5; Defs.' Findings 6; Defs.' Exs. F, G, H; Tr. Vol. 1, at 70:25–71:4, 93:3–93:9).

---

[6]      Except as otherwise noted, all Findings of Fact and Conclusions of Law are supported by a preponderance of the evidence. *See Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820, 2009 WL 8531026, at *2 n.5 (S.D.N.Y. 2009) (citing *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 449 (2d Cir. 2004); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 300 (2d Cir. 1988)). These Findings of Fact and Conclusions of Law also reflect the Court's evidentiary rulings that are material to its determinations. *See Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.*, 367 F. Supp. 2d 514, 517 n.1 (S.D.N.Y. 2005).

8.  Although Ms. Song testified that she "never used margin," according to her Scottrade statements, all of the stocks she purchased and traded were on margin. (Defs.' Findings 6; Defs.' Exs. F–H; Tr. Vol. 1, at 71:19–73:2, 76:11–76:15).

9.  In May 2007, Ms. Song's Scottrade account had a total value of $703,900.18 and in June 2007, it had a total value of $707,371.00. (Defs.' Ex. G).

10. On September 20, 2007, Ms. Song wired $498,000 of these funds to her trading account on the Chinese stock market. (Defs.' Findings 6; Tr. Vol. 2, at 7:8–7:13).

11. Ms. Song also has two real estate investments in Beijing, China, which she testified are worth $600,000 and almost $1,000,000, respectively. (Defs.' Findings 6; Tr. Vol. 1, at 69:21–69:24, 70:5–70:24).

12. There were multiple inconsistencies in Ms. Song's testimony at trial. For instance, Ms. Song testified that she did not realize that Mr. Yao was an amateur, part-time investor (as opposed to a professional, licensed trader), despite her other testimony that she was a close family friend of Mr. Yao, knew that he worked as a full-time civil engineer, and had visited Mr. Yao's family at home on a number of occasions. In addition, Ms. Song testified that she would never entrust her money with an amateur, but also testified that she herself was an amateur, and not familiar with the term "margin," but had invested more than four times the amount she entrusted with Mr. Yao on her own. (Pl.'s Findings 5; Defs.' Findings 6, 8, 16–17, 23; Defs.' Exs. F–H; Tr. Vol. 1, at 44:18, 50:19–51:2, 70:25–71:4, 71:13–72:3, 76:14–76:15, 80:25–81:5, 93:3–93:9).

13. There were also discrepancies between Ms. Song's testimony at trial and statements made in her deposition, including testifying that Mr. Yao "seduced" her into investing her money with him, while stating in her deposition that she had asked Mr. Yao to trade for her. (Defs.' Findings 21; Tr. Vol. 1, at 69:10–12, 87:15–88:10).

14. In light of the inconsistencies in her testimony at trial and between her deposition and her trial testimony, as well as her evasive responses to questions and general demeanor at trial, the court finds that Ms. Song's testimony was not credible.

**B.  Mr. Yao & Yao Bros. LP**

15. Mr. Yao was born in China. He earned a master's degree in civil engineering and worked as a civil engineer in China. (Defs.' Findings 4; Tr. Vol. 2, at 2:19–3:4).

16. In 1991, Mr. Yao moved to the United States after accepting a job in the District of Columbia area where he has remained employed as a full-time engineer ever since. (Defs.' Findings 4; Tr. Vol. 1, at 80:25–81:3; Tr. Vol. 2, at 4:11–4:12).

17.   Around 2001, while Mr. Yao was living in Maryland, he began trading futures and options in his spare time. Mr. Yao became familiar with trading stocks and futures by "using [his own] money to do some part-time investment for [him]self." He did not take any classes in trading stocks and futures, nor did he receive any formal education in finance. (Pl.'s Findings 5–6; Defs.' Findings 4; Tr. Vol. 2, at 3:5–3:13, 3:18–3:25, 36:10–36:14).

18.   Using his own money, Mr. Yao experimented and developed a futures trading strategy which proved very profitable up until the 2008 market crash. (Defs.' Findings 4; Pl.'s Ex. A; Defs.' Ex A; Tr. Vol. 2, at 19:15–19:23, 37:13–37:22, 45:19–45:25).

19.   Mr. Yao was not a professional trader and was not interested in "tr[ying] to manage other people['s] money to make money." He testified that he "never . . . intend[ed] to get into the financial market as the . . . way of [making a] living" and that he "never intended to be a professional in [the] financial market." (Tr. Vol. 2, at 20:6–20:12, 38:2–38:3).

20.   Around 2005, Mr. Yao's brother, Chengyuan Yao, who lives in Houston, Texas, learned about Mr. Yao's investments and asked if Mr. Yao would do some trading for him. Mr. Yao agreed. (Defs.' Findings 4; Tr. Vol. 2, at 11:2–11:8).

21.   In late 2005, Mr. Yao started a limited partnership called Yao Bros. LP in order to pool his and his brother's investment money. (Defs.' Findings 4; Tr. Vol. 1, at 50:19–50:21; Tr. Vol. 2, at 11:2–11:8).

22.   When Mr. Yao established the Yao Bros. LP, he learned on the internet that he qualified for a "small pool" exemption from the Commodity Futures Trading Commission's ("CFTC" or "the Commission") registration requirements. Therefore, Mr. Yao sent an electronic request through the National Futures Association's ("NFA") website for an exemption. He did not receive a response from the NFA. (Tr. Vol. 2, at 11:11–11:25, 12:12–12:25; 16:8–16:15).

23.   After the present suit was filed, Mr. Yao went back to the NFA website and performed a search. He located a record indicating that he was in fact registered with the NFA and "was actually exempted." This record was entered into evidence at trial. (Defs.' Ex. K; Tr. Vol. 2, at 12:15–12:25).

24.   Mr. Yao traded successfully using the approach he developed, earning a substantial return on his and his brother's investments. (Defs.' Findings 5; Tr. Vol. 2, at 20:6–20:9).

25.   After observing his demeanor at trial, and because much of his trial testimony was corroborated by evidence introduced at trial, the court finds that Mr. Yao's testimony was entirely credible.

6

### C. Ms. Song's Investment with Defendants

26. In 2006, through telephone conversations with Mr. Yao's wife, Ms. Song learned about Mr. Yao's successful part-time trading activities. In the summer of 2007, Ms. Song visited Mr. Yao's family in Virginia. During the visit, Ms. Song observed the family's apparent new-found wealth and learned more about Mr. Yao's successful trading. (Pl.'s Findings 2; Defs.' Findings 7; Tr. Vol. 1, at 43:18–44:5, 44:13–44:24, 76:19–76:22; Tr. Vol. 2, at 6:13–6:24).

27. Over the next few months, Ms. Song repeatedly asked Mr. Yao to invest her remaining money (i.e., the portion that was not transferred from the Scottrade account to the Chinese stock market). Ms. Song continued to ask, and Mr. Yao continued to decline her requests, for several months. (Defs.' Findings 7; Tr. Vol. 1, at 77:2–77:6; Tr. Vol. 2, at 6:11–6:24, 7:6–7:9, 7:19–7:25).

28. In 2007, when Mr. Yao felt that Ms. Song would not stop asking for his investment assistance, he agreed that she could send him a small amount of money to invest in the Yao Bros. LP investment pool. (Defs.' Findings 7–8; Tr. Vol. 2, at 7:19–8:3, 8:11–8:17, 41:21–41:25).

29. Mr. Yao told Ms. Song that she could start with a modest sum like $20,000 or $30,000, although she wanted to start with a large amount. In fact, Ms. Song initially asked Mr. Yao to manage all of her investment money (over $700,000), to which Mr. Yao flatly responded "no way." Mr. Yao also informed Ms. Song that, to remain eligible for the "small pool exemption," there had to be less than $400,000 in contributions from investors other than family members. (Defs.' Findings 8; Tr. Vol. 2, at 8:4–8:9, 16:23–17:1, 40:7–40:10).

30. On August 25, 2007, Mr. Yao sent an email to Ms. Song stating:

> The reason I am reluctant to manage your money is mainly because I don't want to lose your money which might happen in any investment. Attached is a chart of the fund performance in the past for you to take a look. You can see sometimes it went down dramatically even though overall it has performed quite well over the last several years. Theoretically the fund involves much higher risk than the general stock market since I am using margin, hedging, and leveraging. If you still want me to manage some of your funds, you may start with 100K to begin with. I will call you on how to wire fund in.

Pl.'s Ex. A; Defs.' Ex A.

31. Mr. Yao attached a "chart of the fund performance" of the Yao Bros. LP brokerage account for 2002 through 2007 to the August 25, 2007 email to Ms. Song. The chart showed an "Annual Return" of 76% for the year 2002, 161% for 2003, 58% for 2004, 93% for 2005, 79% for 2006, and 47% for 2007. (Pl. Ex. A; Defs.' Ex. A).

32.    Mr. Yao informed Ms. Song that he had formed an LP consisting of his brother and himself. Mr. Yao also told Ms. Song that all LP members' money would be pooled into the LP brokerage account and invested together; that he would be the only person making investment decisions; that he mostly traded Standard & Poor's 500 options; and that he would track individual account balances and send monthly account statements. (Defs.' Findings 8; Defs.' Ex. K; Tr. Vol. 1, at 50:19–51:4; Tr. Vol. 2, at 9:21–12:8, 27:17–27:24, 40:11–40:16).

33.    Mr. Yao did not disclose to Ms. Song in writing that he did not have a license to trade future commodities for others, but informed her verbally that "I will send individual account statement as I don't have the license. I do not need the license." (Tr. Vol. 2, at 10:1–10:3, 10:11–10:14).

34.    Mr. Yao also did not disclose to Ms. Song in writing that he was exempt from registration as a commodity pool operator. Specifically, Mr. Yao testified that he "did not disclose in writing but I told her many, many times. At that time I did not really think this was any issue. I thought I was exempted." (Tr. Vol. 2, at 16:19–16:21, 18:7–18:16).

35.    Defendants did not issue a subscription agreement to Ms. Song or prepare a prospectus for the fund. (Tr. Vol. 2, at 17:22–18:6, 18:17–18:24).

36.    Defendants did not inform Ms. Song in writing that she had "a right to redeem at any time," but Mr. Yao "told her that. She asked me [for a redemption] one time. I sen[t] a request directly to my broker within the day and then she back[ed] off [and said] 'no, I don't need money.'" (Tr. Vol. 1, at 80:11–80:21; Tr. Vol. 2, at 29:18–30:4, 43:4–43:11).

37.    As long-time family friends, Ms. Song was aware that Mr. Yao worked full-time as an engineer. Mr. Yao also testified that "I made it very clear I am not a professional. I never intended to be a professional in [the] financial market." (Tr. Vol. 1, at 44:15–44:20, 80:25–81:5; Tr. Vol. 2, at 38:2–38:3).

38.    At trial, Ms. Song testified, unconvincingly, that she thought that Mr. Yao "probably ha[d] the financial adviser license. [H]e never disclosed to me he didn't have a license. And if I knew he is not professional I wouldn't give him money [be]cause I knew in his ability he is not capable. He doesn't have a lot of knowledge to manage people's money and he has no time either." (Tr. Vol. 1, at 90:23–91:10).

39.    At trial, Ms. Song was also asked, "If [Mr. Yao] told you that he was exempt and it was for a small pool investment in future options, would you continue, would you still invest through Mr. Yao?" Ms. Song responded, "No. I think I only give people money who have license." (Tr. Vol. 1, at 91:20–91:23).

40.  On multiple occasions, Ms. Song offered to pay Mr. Yao for his services, but the arrangement was unclear and was not reduced to writing. Mr. Yao testified that "eventually when I agreed to let her in, I said how about this, let's do like something like [a] hedge fund, [and] do it based on the net gain percentage 20 percent. I . . . start[] with ten percent for [a] few months and then like 20 percent. I even explained to [Ms. Song what] net gain is." In other words, Mr. Yao proposed a method to collect a performance-based fee of 10% of the net gain for a few starting months, followed by 20% of the net gain thereafter. Ms. Song orally agreed to this arrangement. (Pl.'s Findings 6; Defs.' Findings 9–10; Tr. Vol. 1, at 53:5–53:17; Tr. Vol. 2, at 20:14–21:2, 41:2–41:5).

41.  Although the performance fees were calculated, they were not shown as having been paid on any statement sent to Ms. Song, and remained unsegregated in the Yao Bros. LP brokerage account. Neither Mr. Yao nor Yao Bros. LP ever collected any fee from Ms. Song. In other words, while the "performance fee" was calculated and noted on a Yao Bros. account summary covering the period 10/1/07 to 9/30/08, these fees were kept unsegregated in the pooled account and no fees were ever paid. In addition, none of Ms. Song's monthly account statements from Mr. Yao reflects any such fee, or the deduction of such a fee. (Pl.'s Exs. B–F; Defs.' Findings 14; Tr. Vol. 2, at 44:22–45:6).

42.  On October 12, 2007, plaintiff wired $105,000 to Mr. Yao. On March 5, 2008, plaintiff sent $38,000 to defendants. On July 31, 2008, plaintiff sent $20,000 to defendants. The total amount of funds wired by plaintiff to defendants was $163,000. (Pretrial Order 2; Pl.'s Ex. B–D; Tr. Vol. 2, at 37:13–37:15).

43.  Each time that Ms. Song wired funds, they were directed to Mr. Yao's or to the Yao Bros. LP's bank account. Mr. Yao always promptly wired the funds to the LP brokerage account, credited the funds to Ms. Song's account, and issued a statement to Ms. Song acknowledging receipt of the funds, and showing her new balance. (Defs.' Findings 11; Pl.'s Ex. B–D).

44.  Mr. Yao also regularly supplied Ms. Song with monthly statements for her account via email to her Hotmail account. (Defs.' Findings 11; Pl.'s Ex. B–F; Tr. Vol. 1, at 58:1–58:5, 67:7–67:12; Tr. Vol. 2, at 29:9–29:17).

45.  For many months, Ms. Song's investments, like defendants' investments, were quite successful. The value of her account increased more than fifty percent in less than one year (from $163,000 in October 2007 to $246,000 in August 2008). Ms. Song was happy with the fund's performance and thanked Mr. Yao. For example, in an email dated December 1, 2007, Ms. Song replied "Thank you for the great job" to Mr. Yao's email attaching a monthly statement. (Defs.' Findings 11; Defs.' Ex. C; Tr. Vol. 2, at 37:13–37:18, 47:7–47:14).

**D. The Market Crash of 2008 & the Loss of the Funds**

46. On October 6, 2008, the stock market dropped dramatically. A margin call forced the full liquidation of the Yao Bros. LP account. Ninety-five percent of the money in the Yao Bros. investment account was lost. Specifically, the account lost $827,000 that day, leaving less than $50,000 in the account, $9,775.49 of which remained in Ms. Song's portion of the Yao Bros. account. (Pretrial Order 4; Pl.'s Findings 7; Pl. Ex. G, J; Defs.' Findings 11–12; Tr. Vol. 2, at 45:19–46:16).

47. After the stock market drop and Ms. Song's substantial losses, she asked Mr. Yao to invest her remaining money, using the same investment strategy, in an effort to recoup her losses. (Defs.' Findings 14; Tr. Vol. 2, at 45:7–45:18).

48. In January 2009, Ms. Song filed a complaint against Mr. Yao and Yao Bros. LP with the CFTC. The CFTC launched a formal investigation, subpoenaing Mr. Yao for all relevant documents and examining Mr. Yao's bookkeeping, account performance, and annual return calculations. (Defs.' Findings 30; Tr. Vol. 1, at 16:7–17:25; Tr. Vol. 2, at 27:17–28:6, 28:19–28:22).

49. In response, Mr. Yao submitted detailed information to the CFTC and answered all of its inquiries through an attorney. Following the investigation, Mr. Yao did not receive any further communications from the CFTC. (Defs.' Findings 15; Tr. Vol. 2, at 28:19–28:22).

50. Up through the time of trial, the CFTC did not take any action on Ms. Song's complaint, and defendants reasonably believe that the CFTC has closed the investigation. (Defs.' Findings 30; Tr. Vol. 2, at 28:5–28:6, 28:19–28:22).

51. In March 2009, Ms. Song filed a complaint against Mr. Yao and Yao Bros. LP with the Virginia State Corporation Commission. The complaint was rejected. (Defs.' Findings 15; Tr. Vol. 1, at 16:15–16:22; Tr. Vol. 2, at 28:5–28:6).

## III.   CONCLUSIONS OF LAW

### A. Trading as a Broker Without Registration or Disclosure

#### *The Commodity Exchange Act & the Commodity Futures Trading Commission*

1. The Commodity Exchange Act ("CEA" or "the Act") was passed "in response to concerns of widespread abuses in commodity futures trading, and in order to protect investors amid 'the volatile and esoteric futures trading complex.'" *Ping He (Hai Nam) Co. v. NonFerrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94, 102 (S.D.N.Y. 1998), *vacated in part on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999) (quoting *CFTC v. Schor*, 478 U.S. 833, 836 (1986)); 7 U.S.C. §§ 1 *et seq.* (2006).

2.   The purpose of the Act "is to insure fair practice and honest dealings of the commodity exchanges and to provide a measure of control over those forms of speculative activity which often demoralize the markets to the injury of producers, customer, and the exchanges themselves." *Bartels v. Clayton Brokerage Co.*, 631 F. Supp. 442, 446 (S.D.N.Y. 1986) (quoting 1974 U.S. Code Cong. & Ad. News 5843, 5844) (internal quotation marks omitted); *CFTC v. British Am. Commodity Options Corp.*, No. 77 Civ. 1822, 1978 U.S. Dist. LEXIS 15769, at \*10 (S.D.N.Y. 1978) ("The legislative history of the [Act] makes clear that it was intended to provide a regulatory mechanism for protecting public investors from abuses in commodity option trading.").

3.   The Commodity Futures Trading Commission is "an independent federal regulatory agency charged with the administration and enforcement of the [CEA] and the regulations promulgated thereunder." *CFTC v. Vartuli*, 228 F.3d 94, 97 (2d Cir. 2000) (citations omitted); *see* 17 C.F.R. §§ 1.1 *et seq.* (2007).

4.   The CEA "grants the CFTC broad discretion to promulgate rules and regulations in furtherance of the Act's goals." *Ping He*, 22 F. Supp. 2d at 102.

5.   Under section 6d(a) of the Act, "[i]t shall be unlawful for any person to engage as [a] futures commission merchant . . . unless . . . such person shall have registered, under this chapter, with the Commission as such futures commission merchant . . . and such registration shall not have expired nor been suspended nor revoked." 7 U.S.C. § 6d(a)(1).

6.   Therefore, under section 12a of the Act, "[t]he Commission is authorized—to register futures commission merchants, . . . commodity pool operators, [and] associated persons of commodity pool operators . . . upon application in accordance with rules and regulations and in the form and manner to be prescribed by the Commission." 7 U.S.C. § 12a(1).

### *The Registration Requirement & the National Futures Association*

7.   The CFTC's regulations include registration regulations which have been characterized as "the kingpin in this statutory machinery." *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 139 (2d Cir. 1977). Indeed, "[t]he registration requirements ensure that persons dealing in commodities meet certain minimum financial and fitness requirements, and enable the CFTC to monitor the trading activities of market members." *Ping He*, 22 F. Supp. 2d at 103.

8.   The CFTC's registration requirements are codified in 17 C.F.R. § 3.1 *et seq.* Under 17 C.F.R. § 3.2(a), "the registration functions of the Commission . . . shall be performed by the [NFA], in accordance with such rules, consistent with the provisions of the Act and this part, applicable to registrations granted under the Act that the [NFA] may adopt and are approved by the Commission." 17 C.F.R. § 3.2(a).

9.  Furthermore, under 17 C.F.R. § 3.4(a), "[e]xcept as may be otherwise provided in the Act or in any rule, regulation, or order of the Commission, each . . . commodity pool operator[7] . . . must register as such under the Act." 17 C.F.R. § 3.4(a).

10. At trial it was established that the Yao Bros. LP would be considered a commodity pool under the regulations, and plaintiff conceded as much in its Proposed Findings. (Pl.'s Findings 8 ("Defendant Yao Bros. Group LP was a commodity pool operator, because all the funds were comingled in one account. The funds are invested or traded collectively on behalf of the entire account, rather than in the name of individual investors.")).

11. For this reason, as plaintiff notes, Yao Bros. LP was required to "either register[] as a commodity trader or appl[y] for exemption from registration." (Pl.'s Findings 8 (citing *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 884 (9th Cir. 1986))).

### *Exemptions to the Registration Requirement*

12. "Limited exemptions to the Act's registration requirements do exist, however." *Ping He*, 22 F. Supp. 2d at 103.

13. Specifically, 17 C.F.R. § 4.13 governs "Exemption from registration as a commodity pool operator" and has two sets of requirements. Under the first set,

> [a] person is not required to register under the Act as a commodity pool operator if: (1)(i) It does not receive any compensation or other payment, directly or indirectly, for operating the pool, except reimbursement for the ordinary administrative expenses of operating the pool;
> (ii) It operates only one commodity pool at any time;
> (iii) It is not otherwise required to register with the Commission and is not a business affiliate of any person required to register with the Commission; *and*
> (iv) Neither the person nor any other person involved with the pool does any advertising in connection with the pool.

17 C.F.R. § 4.13(a)(1) (emphasis added).

---

[7]    Under the regulations, a

Commodity pool operator . . . means any person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery or commodity option on or subject to the rules of any contract market.

17 C.F.R. § 1.3(cc).

14. At trial, it was demonstrated by a preponderance of the evidence that the Yao Bros. LP met the first set of requirements for the small pool operator's exemption because (1) no compensation was received for operating the pool; (2) Yao Bros. LP only operated one commodity pool; (3) Yao Bros. LP was not otherwise required to register with the Commission; and (4) no advertising was conducted in connection with the pool. (Defs.' Findings 5 ("Due to the small and private nature of the LP, it has always been exempted from any registration requirement."); Pl.'s Ex. J; Defs.' Ex. J–K; Tr. Vol. 2, at 18:17–18:24).

15. Furthermore, under 17 C.F.R. § 4.13(a)(2), there is a second set of requirements for exemption from registration as a commodity pool operator:

> (2)(i) None of the pools operated by [the pool operator may have] more than *15 participants* at any time;
>
> *and*
>
> (ii) The total gross capital contributions [the pool operator] receives for units of participation in all of the pools it operates or that it intends to operate do not in the aggregate exceed *$400,000*.

17 C.F.R. § 4.13(a)(2) (emphasis added). In other words, this second set of criteria requires that a pool have fewer than fifteen participants and that the commodity pool operator manages less than $400,000 of total outside capital contributions.

16. At trial, it was also demonstrated that defendants met this second set of requirements for the small pool operator's exemption. Indeed, the pool consisted of only three participants: Mr. Yao, Mr. Yao's brother, and Ms. Song, and the "total gross capital contributions [to the pool] . . . [did not] exceed $400,000." 17 C.F.R. § 4.13(a)(2)(ii).

17. While Yao Bros. LP fell within these exemption requirements, 17 C.F.R. § 4.13(b) further requires that

> (1) Any person who desires to claim the relief from registration provided by this section, must file electronically a notice of exemption from commodity pool operator registration with the [NFA] through its electronic exemption filing system . . . ; [and]
>
> (2) The person must file the notice by no later than the time it delivers a subscription agreement for the pool to a prospective participant in the pool;
> . . .
>
> (3) The notice *will be effective upon filing*, provided the notice is materially complete.

17 C.F.R. § 4.13(b) (emphasis added).

18. At trial, it was demonstrated by a preponderance of the evidence that Mr. Yao complied with the electronic notice of exemption requirement through the NFA website before Ms. Song joined the pool. Indeed, when Mr. Yao established the Yao Bros. LP, about two years before he agreed to invest Ms. Song's money in the pool, he learned on the internet that he qualified for a "small pool category" exemption from the CFTC's registration requirements, and that he could file electronically for such an exemption through the NFA's website. (Defs.' Ex. K; Tr. Vol. 2, at 10:25–12:25; 16:8–16:15).

19. Under the regulation, "[t]he notice *will be effective upon filing*, provided the notice is materially complete." Therefore, Mr. Yao's electronic filing was effective as of the date on which he filed online, which was before Ms. Song joined the pool. In addition, the regulation states that the pool operator "must file the notice by no later than the time it delivers a subscription agreement for the pool to a prospective participant in the pool," which appears to establish a deadline for the filing of the notice. Here, while Mr. Yao did not issue a subscription agreement, it does not follow that he failed to follow this regulation, which requires only that the notice of exemption be filed prior to the issuance of the subscription agreement. (17 C.F.R. § 4.13(b)(2)–(3); Tr. Vol. 2, at 10:25–12:25; 16:8–16:15).

20. Furthermore, after the present suit was filed, Mr. Yao went back to the NFA website and verified that his notice of exemption had been received. He was able to locate an electronic record indicating that he was registered with the NFA and "was actually exempted." (Defs.' Ex. K; Tr. Vol. 2, at 12:12–12:25).

21. Up through the time of trial, the Yao Bros. LP current status on the NFA website remained listed as "Exempt Commodity Pool Operator." (Defs.' Ex. K).

22. Hence, the Yao Bros. LP was a "commodity pool operator" within the meaning of the CFTC regulations. Therefore, defendants were in compliance with the registration requirement of the Act because Mr. Yao properly filed for and received an exemption from registration pursuant to the Commission's regulations.

### *Private Right of Action Under the Commodity Exchange Act*

23. The CEA provides two types of legal actions. First, "[t]he CEA empowers the CFTC to bring *enforcement actions* against violators of the Act and CFTC rules." *Ping He*, 22 F. Supp. 2d at 104 (citing 7 U.S.C. § 15).

24. Second, the CEA "provides several avenues by which injured investors can obtain redress for violations of the Act":

> [Section] 14 of the CEA . . . provides a reparations procedure whereby persons aggrieved by violations of the Act or CFTC rules can seek to recover damages from a registered industry professional by filing a complaint with the CFTC.[8] *See* 7 U.S.C. § 18(a). Complaints brought under § 14 are adjudicated by administrative law judges or presiding CFTC officers, and reparations awards thereunder are enforceable in federal district court. *Id.* Separate and apart from this reparations procedure, § 22 of the Act . . . provides a *private right of action permitting investors to sue directly in federal court for "actual damages"* caused by another's violations of the Act.

*Ping He*, 22 F. Supp. 2d at 104 (emphasis added).

25.    Thus, there is a crucial distinction between CFTC enforcement actions and suits by investors for "actual damages."[9] *Ping He*, 22 F. Supp. 2d at 108 n.10.

---

[8]    As noted, at trial it was demonstrated by competent evidence that in 2009, prior to the filing of this lawsuit, Ms. Song filed a complaint with the CFTC. The CFTC commenced a formal investigation, but up through the time of trial, had not taken any action on Ms. Song's complaint. (Defs.' Findings 30; Tr. Vol. 2, at 27:5–28:6, 28:19–28:22).

[9]    Here, as in *Ping He*, plaintiff fails to appreciate this crucial distinction. In *Ping He*, this Court rejected the plaintiff's "argument that [the defendant's] violation of [any] provision of the CEA will automatically entitle [plaintiff] to disgorgement . . . . Before damages will issue, [plaintiff] must establish some causal link between the violation and its losses, as § 22 requires." *Ping He*, 22 F. Supp. 2d at 108–09 n.10. In doing so, the court noted that

> Ping He misunderstands the critical difference between actions by the CFTC and private litigants. Unlike private litigants, the CFTC is charged by Congress with enforcing all of the CEA's provisions and CFTC rules. In performing that duty, the CFTC can impose penalties upon violators of the Act even where no customer has been harmed; in fact, disgorgement of profits may be particularly effective in that instance because it may deter future illegal conduct and prevent customers from being injured.

*Id.* (citing *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir. 1986); *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1252 (2d Cir. 1986)). "In contrast, there is no legal justification for permitting private litigants to recover damages unless they can show that they were personally harmed by the defendant's violation, in the amount of damages sought." *Id.* (citing *Bangor Punta Operations, Inc. v. Bangor Aroostook R.R. Co.*, 417 U.S. 703 (1974)). Similarly, here, in its proposed findings, plaintiff relies almost exclusively on CFTC enforcement actions in making its case. *See* Pl.'s Findings 7, 8, 10–13 (citing a total of eight CFTC cases and three private cases in support of its claims). For this reason, insofar as plaintiff's arguments rely on the legal standards governing CFTC enforcement actions, these arguments are without merit.

26.   In a CFTC enforcement action, the CFTC can order disgorgement as a penalty for a defendant's failure to register or other failure to comply with the CFTC regulations. *See CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92 (2d Cir. 1986) (ordering disgorgement as penalty for defendant's failure to register and its systematic fraudulent conduct); *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242 (2d Cir. 1986) (ordering disgorgement on the basis of defendants' engagement in prohibited transactions under the Act).

27.   On the other hand, private actions brought pursuant to 7 U.S.C. § 22 require a showing of "actual damages" resulting from a defendant's failure to register, or other failure to comply with a CFTC regulation, in order for an injured investor to recover. *Ping He*, 22 F. Supp. 2d at 104 ("[Section 22] provides a private right of action permitting investors to sue directly in federal court for 'actual damages' caused by another's violations of the Act.") (citation omitted).

28.   Specifically, 7 U.S.C. § 25(a)(1) provides that

>       [a]ny person (other than a registered entity or registered futures association) who violates this chapter . . . *shall be liable for actual damages* resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph *and caused by such violation* to any other person—
>
>>       (A) who received trading advice from such person for a fee;
>>       (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property . . . in connection with any order to make such contract;
>>       (C) who purchased from or sold to such person or placed through such person an order for the purchase or sale . . . an interest or participation in a commodity pool; or
>>       (D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

7 U.S.C. § 25(a)(1) (emphasis added).

29.   In other words, "[t]o maintain a suit under § 22, . . . it is not enough to allege that a defendant violated provisions of the Act." Rather, a "plaintiff must also allege that (1) it incurred 'actual damages' from the alleged violation, and (2) that the damages resulted from one or more of the four transactions enumerated in subsections [7 U.S.C § 25(a)(1)] (A) through (D)." *Ping He*, 22 F. Supp. 2d at 107 (citation omitted); *see also S & A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 953 (8th Cir. 2012) (quoting 7 U.S.C. § 25(a)(1)) ("[T]he plain language of [7 U.S.C.] § 25(a)(1) [has been read] to require that a plaintiff show 'damages . . . caused by [the CEA] violation.' Thus, it is not enough for a plaintiff to show a CEA violation and damages, rather a plaintiff must show that the CEA violation *proximately caused* the damages for which the plaintiff seeks relief.").

16

30. Put another way, "[e]ven if [defendants] violated every provision of the CEA or the CFTC rules, under the express language of § 22, [Ms. Song] is only authorized to bring suit, and can only recover, for those violations that caused [her] to suffer 'actual damages.'" *Ping He*, 22 F. Supp. 2d at 107 (citation omitted).

31. Furthermore, "[t]he term 'actual damages' has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation." *Ping He*, 22 F. Supp. 2d at 107 (citing *Wigod v. Chi. Mercantile Exch.*, 981 F.2d 1510, 1522 (7th Cir. 1992) (holding that "under the explicit terms of the statute," a private litigant has no standing to sue under CEA provisions unless violation of that provision caused him "actual injury"); *Kwiatkowski v. Bear Stearns Co.*, No. 96 CIV. 4798, 1997 WL 538819, at *11 (S.D.N.Y. Aug. 29, 1997) (dismissing damages claim where plaintiff alleged no facts showing that he suffered any loss from the alleged violation).

32. "As a logical matter, it is unlikely that any private litigant could show 'actual damages' flowing from a [failure to register] violation because, as courts and the CFTC have recognized, [a defendant's] unregistered status, in and of itself, does not cause another financial damage." *Ping He*, 22 F. Supp. 2d at 108 (citing *Marshall v. Green Giant Co.*, 942 F.2d 539, 546 (8th Cir. 1991) ("A party does not suffer damage merely by dealing with an unregistered [trader]; failure to register, without more, does not cause pecuniary loss.")).

33. In addition, at trial, plaintiff attempted to prove "[w]hether [defendants have] violated any law and statute by knowingly and willfully trading as a broker while collecting commissions without registering with the relevant future trading regulatory authorities." Pretrial Order 13.

34. This showing fails because (1) no evidence was produced at trial that Mr. Yao or Yao Bros. LP collected any commission whatsoever; and (2) as stated above, Mr. Yao was in compliance with the CFTC regulations, having properly filed for and obtained an exemption, before any subscription agreement was issued, via the NFA website. (Pl.'s Ex. J; Defs.' Findings 14, 29–30; Defs.' Ex. K; Tr. Vol. 1, at 53:5–53:17, 83:4–83:6; Tr. Vol. 2, at 11:9–12:25; 16:8–16:15, 20:14–22:15, 41:10–41:13).

35. Furthermore, even if the court were to determine that defendants failed to properly file for an exemption, or were required to register and failed to do so, Ms. Song did not prove at trial, or even allege as required by 7 U.S.C. § 25(a)(1) that she suffered "actual damages" caused by defendants' failure to comply with the Commission's regulations.

17

*Notice Requirement*

36. Plaintiff also attempted to show at trial "that the Defendants failed to disclose to the Plaintiff that they were not licensed brokers of future and option trading by any regulatory authorit[y]." Pretrial Order 2; Pretrial Order 13 (stating that plaintiff intends to prove at trial "[w]hether [defendants have] broken the law[10] by knowingly and willfully trading as broker while collecting commission without disclosing to the Plaintiff that [Mr. Yao] is an unlicensed and unregistered broker as required by law").

37. Under 17 C.F.R. § 4.13, "eligibility for exemption" from registration

> is subject to the person furnishing in written communication physically delivered or delivered through electronic transmission to each prospective participant in the pool:
>
> > (A) A statement that the person is exempt from registration with the Commission as a commodity pool operator and that therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document and a certified annual report to participants in the pool; and
> > (B) A description of the criteria pursuant to which it qualifies for such exemption from registration.

17 § 4.13(a)(5)(i).

38. There was no showing at trial that Mr. Yao delivered to Ms. Song *a written statement* that the Yao Bros. LP was exempt from the CEA's registration requirements, as required by 17 C.F.R. § 4.13(a)(5)(i).

39. As discussed above, however, a private right of action for such a violation is only available if the violation caused the plaintiff "actual damages." 7 U.S.C. § 25(a)(1).

40. Here, Ms. Song has made no credible showing that Mr. Yao's failure to follow this regulation, by failing to give her a written notice of the exemption, was the proximate cause of her damages.

41. As found above, it was demonstrated by a preponderance of the evidence at trial, that Ms. Song's damages were incurred as a result of (1) her substantial investment in a highly risky trading vehicle, and (2) the historic market decline of 2008, and thus not by defendants' failure to furnish a written statement of exemption.

---

[10]     Throughout these proceedings, including at trial, plaintiff has continuously confused the law (i.e., the CEA) with the Commission's regulations, and has used them interchangeably. In any case, plaintiff's claims fail whether based on the Act itself or the regulations promulgated thereunder.

42. For this reason, Ms. Song's claims based on defendants' failure to comply with the notice requirement in the regulations fail.

### Monthly Statement Requirement

43. Under 17 C.F.R. § 4.13(c)(3),

> Each person who has filed a notice of exemption from registration . . . must: (i) Promptly furnish to each participant in the pool a copy of each monthly statement for the pool . . . ; and (ii) [c]learly show on such statement, or on an accompanying supplemental statement, the net profit or loss on all commodity interests closed since the date of the previous statement.

17 C.F.R. § 4.13(c)(3).

44. Relying on this regulation, plaintiff argues that "[d]efendants [had] a duty to furnish Plaintiff a copy of periodic account statement. None the less, during the period of Plaintiff's investment with Defendants, Plaintiff only received from Defendants some typed, informal emails about her investment with Defendants." (Pl.'s Mem. 3).

45. Contrary to this assertion, however, plaintiff's own trial exhibits demonstrate that these "typed, informal emails" stated "Attached is your monthly statement" and included as an attachment a detailed "Monthly Statement" that complied with the requirements of 17 C.F.R. § 4.13(c)(3). (Pl.'s Ex. B–F; Defs.' Ex. B; Tr. Vol. 1, at 58:1–58:5, 67:10–67:14; Tr. Vol. 2, at 29:9–29:17).

46. Therefore, plaintiff's argument regarding the monthly statement requirement was disproven by the evidence produced at trial because Mr. Yao provided detailed monthly statements to Ms. Song. Furthermore, in order to recover, Ms. Song would have had to prove at trial "actual damages" resulting from a failure to furnish monthly statements, which she did not.

### Plaintiff's Remaining Claims under the CFTC Registration Regulations

47. Finally, Ms. Song tried to show that under 17 C.F.R. § 4.21, "as [Ms.] Song's [commodity pool operator], [commodity trading advisor], and/or investment advisor, Defendants ha[d] a duty to provide Plaintiff with a disclosure document for the pool, and obtain[] from Plaintiff an acknowledgement signed and dated by Plaintiff. . . . However, Plaintiff has never been provided by Defendants with a disclosure document required by law, or any kind of written agreement related to her investment with Defendants." (Pl.'s Mem. 2–3).

48. Section 4.21 is the "required delivery of pool disclosure document" provision of the regulations and states that "each commodity pool operator _registered or required to be registered under the Act_ must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool." § 4.21(a)(1) (emphasis added).

49. It is evident that this disclosure requirement is not imposed upon those commodity pool operators who are not required to register. 17 C.F.R. § 4.21 ("[E]ach commodity pool operator *registered or required to be registered under the Act* must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document."). Because Yao Bros. was not "required to be registered under the Act," it was relieved of the requirement to deliver a Disclosure Document.

50. As determined above, it was shown at trial that defendants were not required to register under the Act and that they properly filed for and received an exemption through the NFA. Therefore, the requirements of 17 C.F.R. § 4.21 relating to the delivery of a disclosure document do not apply to defendants because they were not "registered or required to be registered under the Act."

51. Therefore, it was shown by a preponderance of the evidence at trial, that Ms. Song's remaining claims regarding the CEA's registration requirements fail.


### B. Misrepresentation & Fraud

52. The CEA contains two antifraud provisions: the "fraudulent inducement" provision under 7 U.S.C. § 6b and the "engaging in a fraudulent scheme" provision under 7 U.S.C. § 6*o*. *See S & A Farms*, 678 F.3d at 953 ("[A] party typically uses [§ 6*o*] to assert a fraud claim under the CEA, rather than [§ 6b], which a party typically uses to assert a fraudulent-inducement claim.").

### *Misrepresentation & Fraud by Commodity Pool Operators Under 7 U.S.C. § 6o*

53. Plaintiff cites only to 7 U.S.C. § 6*o* in its pleadings related to its misrepresentation and fraud claim. Pl.'s Findings 9. Therefore, the court has construed this claim as one made pursuant to the fraudulent scheme provision of the CEA.[11]

---

[11]     Based on its pleadings and the proffered testimony, it was entirely unclear before and during the trial whether plaintiff's misrepresentation and fraud claim was made under the CEA or under New York State common law. In fact, there was no indication as to which "statute" plaintiff was referring to in her claims through the time of a status conference held on March 22, 2012, when the court asked plaintiff to provide information as to which body of law she was bringing her claims under. In response, plaintiff sent an email to the court on March 23, 2012 attaching 17 C.F.R. § 4.13. Therefore, the court concluded that plaintiff wished to proceed under the CEA. Defendant, however, relies on New York State law in its proposed findings relating to plaintiff's misrepresentation and fraud claim. Defs.' Findings 19–20.

Although plaintiff does not appear to be arguing fraud and misrepresentation under New York State common law, even if such a claim were argued, it would fail. Both the CEA's antifraud provisions and New York common law require a showing that the defendant made a material misrepresentation. *Eurycleia Partners, LP v. Seward & Kissel*, LLP, 910 N.E.2d 976, 979 (N.Y. 2009) (citing *Ross v. Louise Wise Servs.*, Inc., 868 N.E.2d 189, 195 (2007); *Lama*

54. Section 6*o* of the CEA governs "[f]raud and misrepresentation by commodity trading advisors, commodity pool operators, and associated persons." 7 U.S.C. § 6*o*.

55. Under this section, it is

> unlawful for a . . . commodity pool operator . . . by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; *or* (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1).

56. Several circuits, including this one, have implied a private right of action under this section. *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 109 (2d Cir. 1989); *see also Jarrett v. Kassel*, 972 F.2d 1415, 1420 (6th Cir. 1992). The U.S. Supreme Court has also implied a private right of action under the related antifraud provision of 7 U.S.C. § 6b. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390–91 (1982) (expressly holding that 7 U.S.C. § 6b gives rise to an implied private right of action).

57. Plaintiff argued that (1) "[d]efendants knowingly and willfully misrepresented to Plaintiff as to the facts and risks of futures trading while knowing such representation is false" and that (2) "[d]efendants failed to adequately disclose the risks involved with future and option trading to the Plaintiff before accepting investment funds from the Plaintiff."[12] (Pl.'s Mem. 3; Pretrial Order 2).

58. That is, Ms. Song argued that (1) the "device, scheme, or artifice" defendants employed to defraud her was Mr. Yao's misrepresentations about the risks involved in trading with the Yao Bros. LP., and (2) the misrepresentation or concealment of his unregistered status "operate[d] as a fraud or deceit upon [Ms. Song]." 7 U.S.C. § 6*o*(1).

---

*Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1373 (1996)) ("The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.")). As discussed above, at trial there was no showing that defendants made any misrepresentation. Therefore, a fraud claim, if made under New York law would also fail.

[12] In making its case under 7 U.S.C. § 6*o*, plaintiff erroneously relies exclusively on CFTC enforcement actions, as opposed to private suits brought by investors. Pl.'s Findings 9–12.

59. As to misrepresenting the risks involved in the investment, Ms. Song's position was that "defendants made misrepresentations to the plaintiff that he could manage the plaintiff's fund[s] and make huge unrealistic returns on the investment. The chart he gave to the plaintiff showed that his performance record of Defendant Yao Bros. LP for the previous years were so remarkable and unrealistic." This is because "[t]he chart showed a return of 76% for the year of 2002, 161% for the year of 2003, 58% for the year of 2004, 93% for the year of 2005, 79% for the year of 2006 and 47% for the year of 2007." (Pl.'s Findings 10; Pl.'s Ex. A; Defs.' Ex A).

60. Ms. Song continues, "[t]he chart . . . failed to disclose the risks and other factors that may have contributed to those unrealistic returns. The figures contained [in] the performance chart w[ere] misleading and misrepresentations made on the part of the defendants." Further, "the defendant did not disclose to the plaintiff that his impressive, remarkable, and unrealistic performance were the result of gambling, not from professional analytical work, before he solicited investment funds from the plaintiff." (Pl.'s Findings 10).

61. The evidence at trial did not support this claim, which was belied by the text of Mr. Yao's email of August 25, 2007 to Ms. Song in which he expressly states, "The reason I am reluctant to manage your money is mainly because I don't want to lose your money which might happen in any investment. . . . [T]he fund involves much higher risk than the general stock market since I am using margin, hedging, and leveraging." (Pl.'s Ex. A; Defs.' Ex A).

62. Based on this specific warning given by Mr. Yao to Ms. Song in writing, Ms. Song's claim that Mr. Yao did not warn her of the risks involved with this kind of trading is not credible. This statement clearly discloses the risks involved in the proposed investment and Mr. Yao's reluctance to have Ms. Song invest in his fund.

63. As to the performance chart, it too contained a clear disclaimer: *"!!! Past performance may not be indicative of future results. Investing always involves risk of losing money."* (Pl.'s Ex. A; Defs.' Ex A).

64. Additionally, there was no indication that any of the information on the chart was inaccurate, or "unrealistic" as plaintiff argues, as it appeared to accurately portray the fund's performance, including occasional deep losses that were highlighted in Mr. Yao's email to which the chart was attached. (Pl.'s Ex. A; Defs.' Ex A).

65. Furthermore, Mr. Yao testified credibly at trial that he repeatedly informed Ms. Song of the risks of his trading activities, and in fact attempted to dissuade her from investing with him on several occasions. (Tr. Vol. 1, at 78:2–78:5, 79:8–79:10; Tr. Vol. 2, at 6:5–9:11, 41:10–42:6).

66. Therefore, at trial it was demonstrated by a preponderance of the evidence that defendants made no misrepresentations as to the fund's performance whatsoever. The evidence at trial clearly demonstrated that Mr. Yao disclosed the risks involved in his investments. (Pl.'s Ex. A; Defs.' Ex A).

22

67. Ms. Song's contention that Mr. Yao "purposely concealed the fact that he was not registered with the [NFA]," which thereby "operat[ed] as a fraud or deceit upon her" was also not supported by the evidence at trial. Mr. Yao successfully filed for and received an exemption from the NFA, and was in compliance with the registration requirements. In addition, Mr. Yao testified credibly at trial that he "did not disclose in writing [that he was exempt] but [he] told her many, many times." Thus, there was no concealment of a material fact. (Pl.'s Findings 10; Tr. Vol. 2, at 16:16–17:8).

68. Even if the evidence at trial showed that defendants engaged in some type of fraudulent concealment, which it did not, Ms. Song's testimony that she would not have invested with the fund had she known Mr. Yao was not registered was not credible for two reasons. (*See* Tr. Vol. 1, at 65:20–65:25, 66:15–66:20, 91:2–91:10).

69. First, while Ms. Song claimed at trial that she would not have invested with an amateur, Ms. Song also testified that, prior to investing with defendants, she traded on her own for two years using the Scottrade account without a "professional," investing an amount more than four times the amount she entrusted with Mr. Yao. (Pl.'s Findings 5; Defs.' Findings 6, 23; Defs.' Exs. F–H; Tr. Vol. 1, at 70:25–71:4, 71:13–71:18, 93:3–93:9).

70. The trading activity using the Scottrade account was made on margin. Despite this, Ms. Song also testified that she did not know what the term "margin" meant. Thus, it is evident that Ms. Song was comfortable investing with non-professionals. (Pl.'s Findings 5; Defs.' Findings 6, 23; Defs.' Exs. F–H; Tr. Vol. 1, at 70:25–71:4, 71:13–72:3, 72:14–72:15, 76:14–76:15, 93:3–93:9).

71. Second, the facts at trial established that Ms. Song was a family friend of Mr. Yao, that she knew that Mr. Yao was a civil engineer and was employed full-time in that profession, and that she knew he did some trading on the side only for himself and his brother. This undermines any claim that Ms. Song did not realize that Mr. Yao was not a professional, licensed trader, but an amateur, part-time investor. (Defs.' Findings 8; Tr. Vol. 1, at 44:18, 50:19–51:2, 80:25–81:5; Tr. Vol. 2, at 9:21–10:10, 37:23–38:3, 39:24–40:16).

### *Fraudulent Inducement Under 7 U.S.C. § 6b*

72. Although not cited by either party, plaintiff's arguments at trial and in her post-trial papers seem to track the language of the CEA's fraudulent inducement provision of 7 U.S.C. § 6b. *See S & A Farms*, 678 F.3d at 953 ("[A] party typically uses [§ 6b] to assert a fraudulent-inducement claim.").

73. Under 7 U.S.C. § 6b(2), it is

unlawful . . . for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

> (i) to cheat or defraud or attempt to cheat or defraud such other person;

> (ii) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

> (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person.

17 U.S.C. § 6b(2).

74. In *Ping He*, this Court observed that "[i]f [a plaintiff] can assert any damages claim based upon [a defendant's] unregistered status, it is one under [§ 6b] of Act, on the grounds that [the defendant] fraudulently induced [the plaintiff] to open a futures trading account *by misrepresenting or concealing its unregistered status*." *Ping He*, 22 F. Supp. 2d at 109 (emphasis added).

75. When "[c]ast as a fraudulent inducement claim, there is a causal link between [the defendant's] alleged violation of the statute and [plaintiff's] out-of-pocket losses because, the argument goes, 'but for' [the defendant's] misrepresentation or concealment of its unregistered status, a material fact, [the plaintiff] would not have opened the account with [the defendant] and would not have incurred any losses." *Ping He*, 22 F. Supp. 2d at 109.

76. To be liable for a violation of this provision, however, a defendant must have made a misrepresentation that was "material, false, misleading, and made with scienter." *Vartuli*, 228 F.3d at 100.

77. "[A] statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe*, 789 F.2d at 111 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

78. Ms. Song characterizes Mr. Yao's "misrepresentations" as:

overstat[ing] the profit on the return of the investment in the performance chart, fail[ing] to adequately warn [of] the risks inherent in the trading [of] commodity futures and commodity options in any prospectus, omitt[ing] the material fact that he was not registered with the [NFA], omitt[ing] the material fact that he was not licensed and was not exempted from licensing, omitt[ing] the material fact that he was not an experienced professional trader but a gambler in the volatile futures and options trading markets.

(Pl.'s Finding 11–12).

79. As to the materiality of these "misrepresentations," at trial, Ms. Song testified, unconvincingly, that she had thought "that [Mr. Yao] probably ha[d] the financial adviser license he never disclosed to me he didn't have a license. And if I knew he is not professional I wouldn't give him money cause I knew in his ability he is not capable. He doesn't have a lot of knowledge to manage people's money and he has no time either." (Tr. Vol. 1, at 91:5–91:10).

80. In other words, plaintiff contends that Mr. Yao's misrepresentations and omissions were material because "but for the failure on the part of the defendants to disclose that they were not licensed professional trader or exempted small pool operator, the plaintiff would not invest her money with the defendants." Ms. Song testified that she would only trust her money with a "professional." (Pl.'s Findings 9, 11; Tr. Vol. 1, at 65:20–65:25, 66:10–66:20, 91:7–91:10).

81. As discussed above, however, it was proven by a preponderance of the evidence at trial, including through Mr. Yao's testimony and the performance chart, that defendants did not "overstat[e] the profit on the return of the investment in the performance chart, fail[] to adequately warn [of] the risks inherent in the trading commodity futures and commodity options in any prospectus, omit[] the material fact that [Mr. Yao] was not registered with the [NFA], omit[] the material fact that he was not licensed and was not exempted from licensing, [or] omit[] the material fact that he was not an experienced professional trader." (Pl.'s Finding 11; Pl.'s Ex. A; Defs.' Ex A).

82. Thus, despite Ms. Song's testimony to the contrary, defendants made no misrepresentations, and certainly none that would induce Ms. Song to invest with the Yao Bros. Group.

83. Furthermore, even were the court to find that defendants had made some misrepresentation to Ms. Song, there was no evidence produced at trial that defendants ever attempted to induce Ms. Song to invest with Yao Bros. LP at any time.

84. To the contrary, the evidence at trial showed that Mr. Yao expressly disclosed to Ms. Song in writing that he was "reluctant to manage [her] money." Further, it was demonstrated at trial that Ms. Song repeatedly approached Mr. Yao, directly and through his wife, about her desire to invest in the Yao Bros. LP. (Pl.'s Ex. A; Defs.' Ex A; Tr. Vol. 1, at 77:2–77:8; Tr. Vol. 2, at 6:13–6:24, 7:6–7:13).

85. Despite testifying at trial that Mr. Yao "seduced" her into investing her money with him, during her deposition, Ms. Song conceded that she had asked Mr. Yao to trade for her.[13] (Pl.'s Findings 2, 5; Defs.' Findings 21; Tr. Vol. 1, at 69:10–12, 87:15–88:10).

86. For these reasons, no claim made under 7 U.S.C. § 6b was proven at trial.

### C. Negligence & Breach of Duty of Care

87. Finally, plaintiff attempts to make out a negligence claim under New York State law.[14]

88. Under New York State law, "[t]o establish a cause of action sounding in negligence, a plaintiff must establish the existence of a duty on defendant's part to plaintiff, breach of the duty and damages." *Greenberg, Trager & Herbst, LLP v HSBC Bank USA*, 958 N.E.2d 77, 80 (N.Y. 2011) (citation omitted).

89. Plaintiff attempted to show at trial that "[a]s a trading broker, Defendant owes Plaintiff the duty of care as an agent owes its principal." Pl.'s Mem. 4.

90. Assuming that Mr. Yao owed Ms. Song a duty of care when managing her money, in order for her negligence claim to stand, Ms. Song must demonstrate that Mr. Yao "deviated unreasonably from the standard of care which brokers routinely adhere to." (Defs.' Findings 32 (citation omitted)).

---

[13]     This discrepancy was made clear at trial when defendants' counsel asked Ms. Song, "do you recall that in April of last year I questioned you and took your deposition? Do you recall that?" (Tr. Vol. 1, at 87:15–87:16). Ms. Song responded, "[w]e did meeting at deposition, yes." (Tr. Vol. 1, at 87:17). Defendants' counsel then asked, "[o]n page 89 of that [deposition] transcript I asked you the following question. I am going to read you something and I am going to ask you whether that was my question and you answered. . . .

> [COUNSEL]: Did you know he is trading money for himself trading options?
> [PLAINTIFF]: Yes. I know that.
> [COUNSEL]: And you asked him to trade options for you?
> [PLAINTIFF]: Right.

(Tr. Vol. 1, at 87:22–88:5). Counsel then asked, "[w]ere those correct questions and answers, what I just read to you?" to which Ms. Song responded, "I can't imagine. This is the same thing?" (Tr. Vol. 1, at 88:8–88:10).

[14]     Plaintiff also argues in its proposed findings that "[d]efendants' violation of a statute was a negligence per se." (Pl.'s Findings 8). As has been seen, at trial plaintiff failed to demonstrate that defendants violated any statute, therefore negligence per se does not apply here.

IV.   **CONCLUSION AND ORDER**

For the foregoing reasons, the Clerk of Court is to enter judgment in favor of defendants and against plaintiff.  Further, the Clerk of Court is to close this case.


_____/s/ Richard K. Eaton_____
Richard K. Eaton

Dated: June 26, 2013
New York, New York

28